**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


**PENSACOLA FIREFIGHTERS' RELIEF
PENSION FUND BOARD OF TRUSTEES,**
          **Plaintiff,**

**vs.**                                         **Case No. 3:09cv53/MCR/MD**

**MERRILL LYNCH PIERCE FENNER
& SMITH, INCORPORATED,**
          **Defendant.**

_____

**REPORT AND RECOMMENDATION**

          **Now before the court is intervenors' motion for protective order (doc. 192). Intervenors ask the court to prohibit plaintiff's discovery of electronic mail communications ("email") transmitted over defendant's server.  Intervenors assert attorney-client, work-product, and joint defense agreement privileges in these communications.  Plaintiff responded in opposition, contending:**

**1.      The motion is untimely because intervenors knew plaintiff requested production of the communications and the court ordered production in 2010.**

**2.      The communications are not privileged because they were transmitted over defendant's server, thus eliminating a reasonable expectation of privacy.**

**3.      Intervenors do not have a separate privilege in the documents; the privilege belonged to defendant and it waived the privilege.**

**4.      Intervenors did not show the existence of a joint defense agreement.**

**5.      If a joint defense agreement existed, defendant waived both parties' privilege under the agreement.**

6.      The parties' disclosure to the Securities and Exchange Commission ("SEC") in conjunction with agency investigations waived the asserted privileges. (Doc. 195).

Intervenors asserted seven arguments in reply to defendant's brief:

1.      Plaintiff's objection to the motion for protective order is really an untimely objection to the original motion to intervene, which plaintiff did not oppose and which the court granted on April 20, 2011.

2.      Defendant's internal email policy does not defeat intervenors' privilege.

3.      Intervenors' privilege in the documents is separate from defendant's and defendant cannot waive it for intervenors.

4.      Intervenors and defendant had a valid joint defense agreement.

5.      The joint defense agreement rendered the communications privileged, and that privilege has not been waived.

6.      Any disclosure to government agencies does not constitute waiver of privilege.

7.      Intervenors demonstrated privilege in the communications for which they seek the protective order.

On June 20, 2011, the court held a hearing on intervenors' motion for protective order.  At the conclusion of the hearing, the court ordered intervenors to provide the court with additional documentation evidencing a joint defense agreement.  It also ordered plaintiff to provide the court with citations to federal regulations stating, as plaintiff argued, that all of defendant's documents and communications, including internal communications, were subject to SEC inspection at any time.  The parties submitted the requested materials (docs. 213, 216-226).  Additionally, the court granted requests from intervenors and defendant to submit brief responses to plaintiff's filings regarding federal regulations (see docs. 223, 224).  For the reasons set forth herein, the undersigned recommends the court grant intervenors' motion for protective order.

## LEGAL STANDARD

Rule 26(c), Federal Rules of Civil Procedure, governs protective orders.  It states in pertinent part:

> The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
>  . . .
>
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters. . ..

Fed. R. Civ. P. 26(c)(1)(D).  In addition to the "good cause" standard, the district court has a duty to balance the interests of the respective parties.  *Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985).  Although a district court has broad discretion in fashioning a protective order, it must articulate its reasons for granting the order "sufficient for appellate review."  *In re Alexander Grant & Co. Litigation*, 800 F.2d 352 (11th Cir. 1987).  The movant bears the burden of showing the necessity for protecting the documents, "which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."  *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978).[1]

## DISCUSSION

### A.   Timeliness of Motion

Plaintiff, Pensacola Firefighters' Relief Pension Fund Board of Trustees ("Firefighters") contend intervenors' did not timely assert their right to intervene because they knew or should have known of their interest in the documents "months before filing their motions" (doc. , pp. 4-5).  Intervenor Mr. Callaway was a defendant in this case, but the parties stipulated to his dismissal on June 26, 2009 (doc. 192, ex. D, p. 2).  The Callaways learned in August 2010 that the court found Merrill Lynch,

---

[1]  Former Fifth Circuit decisions issued before October 1, 1981, are binding precedent on the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

Pierce, Fenner & Smith, Inc. ("Merrill") waived its privilege to documents Firefighters requested through discovery.   Mr. Callaway believed he may have had legal privileges to some of the documents.   In September 2010, the Callaways informed Merrill's counsel that they intended to assert all applicable privileges.   They learned in February 2011 that Merrill was going to produce the possibly privileged documents.   (*Id.* at p. 6).   The remaining intervenors assert they did not learn that Merrill intended to produce possibly privileged documents until their counsel received a letter from Merrill's counsel on February 4, 2011 (doc. 192, p. 9).   On March 3 and 4, intervenors submitted privilege logs to Merrill describing the attorney-client communications and communications among members of what they claimed was a joint defense group (*id.* at p. 10).   Intervenors filed a consent motion to stay production of documents on March 17, 2011, which the court granted (docs. 174, 183).   They filed a motion to intervene on April 19, 2011 (doc. 186).   Plaintiff did not oppose the motion.

> There are four factors relevant to the timeliness of a motion to intervene:
>
> (1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that their motion was timely.

*Georgia v. United States Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) (citing *Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989); *see also Ruderman ex rel. Schwartz v. Washington Nat. Ins. Co.*, 263 F.R.D. 670, 677 (S.D. Fla. 2010) (intervenors' motion filed eight months after initial complaint but less than four months after plaintiffs moved for injunctive relief was timely).

Generally, a motion for protective order is timely if it is made prior to the close of discovery.  *In re Coordinated Pretrial Proceedings, etc.*, 669 F.2d 620, 622 n.2 (10th Cir. 1982); *United States v. IBM Corp.*, 70 F.R.D. 700, 701 (S.D.N.Y. 1976).

<u>Analysis</u>

The undersigned does not agree with Firefighters that the "clock" for filing a motion to intervene should run from November 2009 when the court found Merrill waived its privilege to documents for failing to file privilege logs (*see* doc. 67).  Mr. Callaway was terminated as a defendant in June 2009 (doc. 37).  Although Mr. Callaway's counsel's office may have continued to receive court notifications, it is not common attorney practice to review standard court mailings for cases where the client–if Mr. Callaway even remained a client–is no longer a party.  Furthermore, Firefighters' argument that "Intervenors Brown, Cole and Swanson should have known of this issue and admittedly sat on their rights from at least February to April," is unpersuasive (doc. 195, p. 6).  At the hearing, Firefighters asserted that the intervenors knew each other, so Brown, Cole, and Swanson's counsel *must* have known about the privilege issue by September 2010 because Mr. Callaway knew.  Essentially, Firefighters argues that by virtue of their common interest in the litigation, knowledge of one should be imputed to all.  Firefighters assert the exact argument opposite for privilege purposes, and cannot base their argument on imputed knowledge based on a common interest for timeliness purposes.  The common knowledge assertion is speculative; no facts have been shown to prove it.

It is true that the Callaways could have intervened before the other intervenors.  Their communication with Merrill in September 2010 stating they intended to assert their privileges is evidence that they knew of a potential problem before Merrill informed them in February 2011 that it intended to produce the documents (doc. 192, ex. D, p. 6).  Brown, Cole, and Swanson's counsel received a letter from Merrill's counsel on February 4, 2011, informing her that Merrill was ordered to produce the documents at issue (doc. 192, ex. C, pp. 5-6).  Brown, Cole, and Swanson reasonably could have intervened after that date.

However, instead of filing a motion, intervenors communicated directly with Merrill to resolve the issue.  Merrill exchanged documents with intervenors on February 22, 2011, and intervenors submitted privilege logs to Merrill on March 3 and 4, 2011 (doc. 192, pp. 9-10).  Therefore, about one month elapsed between intervenors' knowledge that Merrill would definitely have to produce documents to which they might have a privilege and intervenors' detailed log communicating to Merrill for which documents they were asserting privilege.  Intervenors filed the motion to intervene on April 19, 2011, about six weeks later.  Between February 4 and April 19, the court granted three motions to extend time to produce or to stay production, to which Firefighters consented.

The undersigned finds that waiting until April 19, 2011 to move to intervene does not make the motion untimely under these facts.  The intervenors did not "[sit] on their rights" as Firefighters contend (*see* doc. 195, p. 6 n.3).  Intervenors' counsel were in contact with Merrill's counsel and investigating whether there was a claim to assert and attempting to resolve the dispute without court intervention.  When that course of action failed, intervenors filed an unopposed motion to assert their privilege claims.

The undersigned further finds the prejudice to intervenors outweighs that of the other parties if the court were to deny their motion based on timeliness.  The parties agree that this action involves voluminous documents, and the documents at issue are a small fraction of the total.  Intervenors have a right to protect themselves from litigation based on privileged communications.  This interest supercedes Firefighters interest in obtaining discovery.

Finally, the undersigned notes that intervenors' motion was, in fact, unopposed.  The gist of Firefighters' response to why it didn't object is that it would have objected had it known what it knows now.  If Firefighters questioned intervenors' representations regarding their knowledge of "imminent production" (doc. 194, p. 4 n.2), it should have investigated those representations in April.  The motion to intervene (doc. 192) was timely.

**B.   Intervenors' privilege in Merrill's documents**

The attorney-client privilege protects "confidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct., 1569, 1577, 48 L. Ed. 2d 39 (1976).  To invoke attorney-client privilege, the movant must establish the following: 1) the communicator is or sought to become a client; 2) the receiver is a lawyer acting as a lawyer; 3) the communication " relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort;" and 4) the movant claimed the privilege and has not waived it.  *United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990).[2]

Once the movant establishes the elements to invoke attorney-client privilege, the court will protect the communication if it was: "(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and *understood* to be confidential." *Id.* at 1551 (citing *United States v. Bell*, 776 F.2d 965, 971 (11th Cir. 1985) (emphasis in original).  In *Noriega,* the court assumed Noriega signed a valid release stating he understood that *all* of his telephone conversations, including those with his attorneys, would be recorded. *Id.* at 1551.  Under that assumption, the court stated that "if Noriega did intend his conversations with his defense attorneys to be confidential, after signing a release, the District Court would be required to ascertain whether this expectation was reasonable."  *Id.*

The work-product privileges is broader than the attorney-client privilege.  It protects "materials prepared by the attorney, whether or not disclosed to the client"

---

[2]  CNN wanted to broadcast recordings of conversations between Noriega and his attorneys while he was in prison.  The district court issued three orders temporarily restraining CNN from broadcasting the tapes and ordering it to produce them for the court's review.  The Eleventh Circuit's primary concern was the balance between Noriega's Sixth Amendment right to a fair trial and CNN's First Amendments rights as press.  The Eleventh Circuit ordered CNN to produce the tapes for the district court's review.  *Id.* at 1552.

and "material prepared by agents for the attorney."  *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979); *see Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994) (lawyers must be able to work in privacy free from unnecessary intrusion by opposing parties and counsel).  It recognizes the attorney's need to communicate with agents and consultants to adequately represent a client.  These communications are generally not discoverable.  *In re Cendant Corp. Sec. Litigation*, 343 F.3d 658, 661-62 (3d Cir. 2003); *Cooper Health Sys. v. Virtual Health, Inc.*, 259 F.R.D. 208, 214 (D.N.J. 2009) (non-parties' motion for protective order based on community interest privilege for emails not prepared by or for attorneys and sent to non-parties regarding the lawsuit between parties was denied because they failed to show underlying work product privilege).

<u>Analysis</u>

To succeed on the merits intervenors must (1) establish that the communications contained in their privilege logs are privileged and (2) show that the privilege exists despite Merrill's waiver.  The communications at issue took place in late 2005 and 2006 in the midst of an SEC and FINRA investigation into Merrill's trading practices, which implicated its employees' practices as well (doc. 192, p. 2 & ex. C).  Merrill utilized its corporate counsel and outside counsel to aid in preparation and defense against the federal investigations.  Many employees, including intervenors, hired independent counsel for the same purpose.  (Doc. 192, ex. C, ¶ 2,3).  Intervenors' attorneys submitted sworn affidavits stating they exchanged email communications with their clients and Merrill's counsel, over Merrill's computer server, to Merrill employee email accounts, discussing legal issues associated with their defense against the federal investigation (doc. 192, exs. C & D).  The attorneys also submitted privilege logs outlining dates, senders and recipients, and subjects of the communications for which they seek a protective order (doc. 192, exs. A & B).

Upon reviewing the arguments and privilege logs, intervenors have met the burden of demonstrating they engaged in communications that fall under the

attorney-client or work-product privilege exception to production, and they expected those communications to remain confidential.  The objective reasonableness of that expectation is discussed *infra*.

Firefighters claim in its response to the motion for protective order and at the June 20, 2011, hearing, that the privilege logs are inadequate.  It cites to *In re Grand Jury Subpoena*, 831 F.2d 225 (11th Cir. 1987) for the proposition that privilege must be claimed on a document-by-document basis (*see* doc. 195, p. 25).   However, intervenors have put forth a document-by-document basis for claiming privilege by submitting privilege logs.  Firefighters cannot make a blanket claim that the logs fail to sustain a privilege claim.  If it wishes to contest the logs, it must provide the court with specific objections to specific entries.


C.   Existence of Joint Defense Agreement

District courts within the Eleventh Circuit recognize the joint defense agreement under the common interest doctrine and apply it to the same range of communications that are protected under the attorney-client privilege.  *See Hope for Families & Comm. Serv., Inc. v. Warren*, 2009 WL 1066525 (M.D. Ala. Apr. 21, 2009). To assert the privilege, the party must show:   1) an agreement (though not necessarily in writing) to cooperate through a common enterprise towards an identical legal strategy; 2) the communications were given in confidence, and the client reasonably understood this; 3) the joint strategy was more than "merely the impression of one side."  *Denny v. Jenkins & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004).  The court in *Robert Bosch LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142 (D.Del ,2009) explains in detail the requirements and extent of the privilege, drawing on the most commonly cited cases:

> The common interest privilege protects communications between individuals and entities and counsel for another person or company when the communications are "part of an on-going and joint effort to set up a common defense strategy."  In other words, members of the community of interest "must share at least a substantially similar legal

interest." The burden is on the party asserting the privilege to establish its existence by showing that "<u>(1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.</u>"[*Bevill* test] Moreover, to qualify for and to maintain continued protection, the communication must be shared between counsel. Recognizing that the common interest privilege operates in derivation of disclosure, the attorney-sharing requirement prevents abuse, such as, post hoc justification for a client's impermissible disclosures. Therefore, it is available when counsel share information to coordinate legal strategies. Generally, under the joint defense or common interest rule, the attorney-client privilege is not automatically waived regarding joint consultations or exchanges of information, with each party retaining the right to voluntarily waive the privilege. Thus, a waiver by one does not automatically operate as a waiver by the other. However, when disclosure of a confidence is made to an unrelated third-party by one sharing a common interest with another and this occurs with the knowledge, awareness or consent of the other, the attorney-client privilege is waived as to the subject matter of the disclosure.

264 F.R.D. at 146 (citing in footnotes *In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007); *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120 (3d Cir. 1986); *In re Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381 (S.D.N.Y. 1975).[3] "[T]he weight of authority is that the common interest doctrine extends at least to situations 'where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995)

---

[3] Under Florida law, three questions determine whether the common interest privilege, applies:

> (1) whether the original disclosures were necessary to obtain informed legal advice and might not have been made absent the attorney-client privilege; (2) whether the communication was such that disclosure to third parties was not intended, and (3) whether the information was exchanged between the parties for the limited purpose of assisting in their common cause.

*Visual Scene, Inc. v. Pilkington Brothers, PLC.*, 508 So.2d 437, 441 (Fla. Ct. App. 1987). The most important factor is "whether the information was exchanged for the limited purpose of assisting the parties' common, litigation-related cause." *Id.*

All claims of attorney-client privilege, including a joint defense strategy claim, require "a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given." *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) (recognizing joint defense privilege between defendant, attorney, bank founder, and accountant). *But see Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (sharing a desire to succeed in an action is not enough to create a common interest where there was no evidence of an agreement, bank was never party to the action, and bank never exercised control over or contributed to legal expenses).

<u>Analysis</u>

Intervenors' motion for protective order offered affidavits of five attorneys swearing intervenors and Merrill had a valid joint defense agreement during the relevant period (doc. 192, exs. C-G).  While the court does not discount the value of a sworn affidavit, at the hearing it expressed reservation about ruling on such an important matter absent any contemporaneous proof of an agreement. Subsequently, intervenors filed under seal several contemporaneous communications clearly showing the parties believed they had a joint defense agreement and were operating under that assumption (doc. 214).  The undersigned finds the intervenors and Merrill had a valid joint defense agreement under the *Bevill* factors.  The submitted communications in combination with the log entries show the communications were made for the purpose of devising and executing a common defense strategy during a federal investigation.  Finally, Merrill's waiver of privilege does not effect intervenors' ability to assert privilege. *See Cox*, 17 F.3d at 1417).  Intervenors have demonstrated grounds for individual attorney-client privilege and work-product privilege and have shown they had a valid joint defense agreement entitling them to protect the privileged communications from production.

**D.   Merrill's Internal Email Policy**

To show confidentiality such that a communication is protected from discovery under attorney-client privilege, the movant must meet a subjective component and an objective component; "the communication must be given in confidence, and the client must *reasonably* understand it to be so given." *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (S.D.N.Y. 2005) (citing *Schwimmer*, 892 F.2d at 244).   The test for attorney-client privilege is similar to the test to determine whether a party had a "reasonable expectation of privacy" under Fourth Amendment and common law right of privacy principles.   A person asserting a Fourth Amendment right of privacy must demonstrate a subjective expectation of privacy that society accepts as objectively reasonable.  *In re Asia*, 322 B.R. at 257 (citing *California v. Greenwood*, 486 U.S. 35, 39, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988).  An employee's reasonable expectation of privacy "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation."  *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987).  Work environments vary, so whether an employee has a reasonable expectation of privacy in his work environment must be decided on a "case-by-case basis."  *In re Asia*, 322 B.R. at 257.

Analysis

Firefighters cites abundant case law to support its proposition that an employee does not have a reasonable expectation of privacy where a company handbook warns that electronic communications are not confidential and are subject to monitoring.  (*See* doc. 195, pp. 9-12).  Firefighters submitted a portion of Merrill's internal email policy, which states:  "E-mail is not confidential; employees have no right to privacy for any e-mail messages transmitted through the Firm e-mail system."  (Doc. 204, ex. 7).

This policy undercuts intervenors' assertion that their communications over the firm email server using their Merrill email addresses are privileged.  There is no question Messrs. Brown, Callaway, Cole, and Swanson subjectively "gave" the communications in confidence.  Their counsel's communications were equally

subjectively given in confidence.   The dispositive question is:   under the circumstances, could intervenors reasonably believe their communications were actually given in confidence despite Merrill's email policy?  As discussed, Merrill and intervenors had a joint defense agreement allowing the intervenors, Merrill executives, and their respective counsel to communicate with each other to defend against the FEC and FINRA investigations.  In the face of investigation, possible prosecution, and undoubted turmoil at Merrill's branch office, it is objectively reasonable for an employee to believe his frequent inter-office and extra-office email communications between Merrill's counsel, employee counsel, accountants, and other people necessary to effect a common litigation strategy when Merrill's "First Vice President, Assistant General Counsel" endorsed and participated in the communications (doc. 192, ex. E).  Therefore, intervenors do not waive their privilege in the relevant communications by disregarding the internal email communication policy.

E.    Effect of Federal Regulations on Joint Defense Agreement

        Firefighters argued for the first time at the June 20, 2011, hearing that federal regulations unequivocally prevented intervenors from asserting any privilege because the regulations mandate that federal agencies (such as the SEC) may inspect any and all of Merrill's records, including communications, at any time. Firefighters asserted these regulations eliminate any reasonable expectation that emails sent over the Merrill server are private.  In support, Firefighters submitted a letter-form brief and exhibits of regulations and administrative proceedings regarding record keeping by exchange members, brokers, or dealers (docs. 216-226). The letter states:

        Accordingly, the language incorporated into Merrill Lynch's Manual is
        not an internal policy which it is free to change, alter, or by-pass in any
        way.  Instead, broker-dealers, such as Merrill Lynch, are subject to
        censure and fines, and Merrill Lynch in fact has been censured and

fined, for failing to comply with Applicable SEC regulations on document retention and production to the regulators.

(Doc. 216).   The undersigned has extensively researched the regulations and releases Firefighters submitted and associated regulations and finds nothing to support Firefighters' argument.   In fact, these sources refer to preserving and keeping records of all communications relating to "business as such", indicating records kept in the ordinary course of business.  *See, e.g.,* 17 C.F.R. § 240.17a-4(5) ("relating to the business of such member, broker or dealer, as such"); § 240.17a-4(7) ("business as such").

Firefighters rely on 15 U.S.C. § 78q (2006) (doc. 221) for the proposition that "All records of such persons described in subsection (a) of this section are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission . . .."  But Firefighters overlook Subsection 78q(j):

> **(j) Authority to limit disclosure of information**
> Notwithstanding any other provision of law, *the Commission shall not be compelled to disclose any information required to be reported under subsection (h) or (i)* of this section or any information supplied to the Commission by any domestic or foreign regulatory agency that relates to the financial or operational condition of any associated person of a broker or dealer, investment bank holding company, or any affiliate of an investment bank holding company. Nothing in this subsection shall authorize the Commission to withhold information from Congress, or prevent the Commission from complying with a request for information from any other Federal department or agency or any self-regulatory organization requesting the information for purposes within the scope of its jurisdiction, or complying with an order of a court of the United States in an action brought by the United States or the Commission. For purposes of section 552 of Title 5, this subsection shall be considered a statute described in subsection (b)(3)(B) of such section 552. *In prescribing regulations to carry out the requirements of this subsection, the Commission shall designate information described in or obtained pursuant to subparagraphs (A), (B), and (C) of subsection (i)(5) of this section as confidential information for purposes of section 78x(b)(2) of this title.*

15 U.S.C. § 78(j) (emphasis added).  Under this subsection, the Commission can deem confidential broker-dealer records of communications, subject only to disclosure to Congress or by court order.  *See also* 15 U.S.C. § 78x (Commission must show records are "needed" before disclosing confidential information, despite FOIA).

Equally unpersuasive is citation to In the Matter of Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Exchange Act Release No. 53,473, 87 SEC Docket 1550 (Mar. 13, 2006).  (*See* doc. 226).  In this proceeding, the Commission instituted cease-and-desist proceedings against Merrill for violating federal securities law by failing to have in place a system to retain emails and promptly produce requested emails.  *Id.*  The Commission's proceeding is not about the SEC requiring or Merrill failing to turn over privileged documents, and is therefore irrelevant to Firefighters' argument.

Finally, Firefighters rely on a 1997 SEC release detailing reporting requirements for brokers and dealers.  (Doc. 222); Reporting Requirements for Brokers or Dealers under the Securities Exchange Act 1934, Exchange Act Release No. 38,245, 1997 WL 46859 (Feb. 5, 1997).  However, the release contains the following passage:

IV. Electronic Communications

Finally, the Commission is aware that many questions have been raised regarding the applicability of Rule 17a-4(b)(4) to electronic mail communications ("e-mail") and Internet communications. In the May Interpretive Release, the Commission discussed its beliefs regarding the adaptation of SRO supervisory review requirements governing communications with customers to accommodate the use of electronic communications by broker-dealers. *The Commission recommended that the SROs work with broker-dealers with respect to the adaptation of such rules and recommended that the SRO rules concerning the supervisory requirements for electronic communications "should be based on the content and audience of the message and not merely the electronic form of the communication."*

> The Commission understands that broker-dealers use e-mail and the Internet to communicate important information relating to the broker-dealer's business internally, to customers, and to the general public. The Commission is also aware that many broker-dealers use such electronic systems to communicate about issues unrelated to the business of the broker-dealer. *Consistent with the Commission's recommendation to the SROs regarding the appropriate standard for prior supervisory review for electronic communications, the Commission believes that for record retention purposes under Rule 17a-4, the content of the electronic communication is determinative, and therefore broker-dealers must retain only those e-mail and Internet communications (including inter-office communications) which relate to the broker-dealer's "business as such."*

1997 WL 46859 at *5 (emphasis added).   If regulations existed that clearly demonstrated either intervenors' waiver of, or inability to assert, privilege, Firefighters would have submitted it.  Instead, it submitted regulations, rules, and administrative decisions detailing reporting requirements generally, and specifically exempting confidential information in most circumstances.

## CONCLUSION

Intervenors seek to prevent production of email communications made between intervenors, their attorneys, Merrill's executives, Merrill's attorneys, and other consultants falling within the attorney-client privilege and work-product privilege exceptions to the general rules of production and discovery.  *See* Fed. R. Civ. P. 26(b).  Intervenors have demonstrated they hold a valid individual privilege in the communications described in their logs.  They have demonstrated they had a valid joint defense agreement with Merrill during the relevant time period, and that Merrill's waiver of privilege does not affect intervenors' privilege.  It was reasonable for intervenors to disregard the internal email policy, which states communications are not confidential, when a senior member of Merrill's corporate counsel agreed to and participated in the use of office email communications for joint defense discussions.  Firefighters have failed to put forth industry regulations that show

intervenors waived their privilege through previous production to the SEC, or that they had no expectation of privacy under federal law.  For these reasons, the undersigned finds intervenors have shown good cause for issuance of a protective order preventing production of the communications described in their privilege logs (*see* doc. 192, exs. A &B).

Accordingly, it is respectfully RECOMMENDED that Intervenors' motion for protective order (doc. 192) be GRANTED.

At Pensacola, Florida, this 7th day of July, 2011.

/s/ *Miles Davis*

MILES DAVIS
UNITED STATES MAGISTRATE JUDGE